**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**

**DAVID AND GABRIELLA SCHULTZ,**

       Plaintiffs,

**v.**                                      **CIVIL ACTION NO. 3:12-CV-15
(JUDGE GROH)**

**DAN RYAN BUILDERS, INC. and
EAGLE EXCAVATING & CONTRACTING,
LLC,**

       Defendants.

## ORDER GRANTING DEFENDANT DAN RYAN BUILDERS, INC.'S MOTION TO COMPEL ARBITRATION

On March 21, 2013, Defendant Dan Ryan Builders, Inc. ("DRB") filed a Motion to Compel Arbitration [Doc. 18]. On March 27, 2013, Plaintiffs filed their response in opposition to DRB's motion. On April 3, 2013, DRB filed its reply. On May 29, 2013, the Court held an evidentiary hearing in this matter to hear the parties' arguments, listen to testimony, and receive evidence. For the following reasons, the Court finds that Defendant DRB's Motion to Compel Arbitration should be granted.

### I. Facts and Procedural History

The Court finds the following facts based upon the evidence and testimony presented at the final hearing.

Plaintiffs are a married couple residing in Hedgesville, West Virginia. Mrs. Schultz graduated high school in 1987. In 1993, she obtained a certificate for an accounting program from the Abbey Business Institute. The program was a ten-month

course that required in-person attendance.  Mrs. Schultz is currently employed in medical billing, and she has worked in the medical billing field for approximately twenty years.

Mrs. Schultz testified that her husband has a bachelors degree in photography.[1] He graduated from high school in 1984 and received his college degree around 1989 from the University of Rochester.  He is currently employed as a machinist at Endeavor Technologies in Buckeystown, Maryland.

In 2006, Plaintiffs decided they wanted to build a home.  At that time, Plaintiffs resided in Falling Waters, West Virginia, in a home they had previously purchased together.  Plaintiffs began investigating and researching different builders.  Plaintiffs checked into DRB and S&A Homes, another builder  in Berkeley County.  S&A Homes' subdivision was located directly across from DRB's subdivision that Plaintiffs ultimately selected for their home site.  Plaintiffs looked at the development owned by S&A Homes and spoke with their sales representatives about the possibility of building a home. However, Plaintiffs selected DRB to build their home because they liked the subdivision and lots better than S&A Homes' subdivision and lots.  During the home buying process, Plaintiffs were not represented by a real estate agent.

On July 3, 2006, Plaintiffs entered into an initial sales contract with DRB. Plaintiffs agreed to purchase from DRB a new residential home, located in Hedgesville, West Virginia.  Mrs. Schultz testified that she and her husband met with a DRB sales

---

[1]Mr. Schultz did not appear to testify before this Court.  Therefore, any testimony regarding his education, background, or understanding of the contract is derived from Mrs. Schultz.

representative in a sales trailer located in the subdivision.  Mrs. Schultz recalled signing the contract, and she testified that it took only five or ten minutes.  Later, on cross examination, Mrs. Schultz stated that the entire process to select options and review the Agreement of Sale took about an hour to an hour and a half.  She stated that none of the terms were explained to her.  Mrs. Schultz testified that the DRB sales personnel only said "initial here, sign here" and did not review any of the contract's terms.  However, on cross examination, Mrs. Schultz admitted that the DRB sales representative would review the first page of the contract, highlight some of the provisions, and then have them sign on the bottom of the page.  Additionally, Mrs. Schultz acknowledged that the DRB salesperson did this with every page.  The sales contract was seven pages plus eight pages of addenda, for a total of fifteen pages. However, Mrs. Schultz pointed out that the DRB salesperson did not go over every possible thing in the contract, but that she was aware of the purchase price and the provision regarding using a preferred lender.  Mrs. Schultz also admitted that the DRB sales representative went through the contract, starting from the first page through the last, including the addenda.  Mrs. Schultz stated that when reviewing the contract, they were given an opportunity to ask questions and read through it. She also testified that they were given as long as they wanted to read through the contract and review it prior to signing.

Mrs. Schultz testified that when she and her husband entered into the contract, they were provided with a copy of the contract, addenda, and selections and options they had made.  Mrs. Schultz admitted, though, that she and her husband only skimmed the documents.  She did not seek legal representation to assist in reviewing the

3

contract, although she conceded that she could have retained an attorney.

Mrs. Schultz testified that DRB did not explain Paragraph 19, the arbitration provision, at any point in the process.  She stated that she had never encountered the term arbitration before and did not understand its meaning at the time she entered into the contract with DRB.  Mrs. Schultz testified that no one mentioned the arbitration provision to her at the time she and her husband signed the original sales contract or at closing.

On July 3, 2006, Plaintiffs and their salesperson, Chara Hickman, walked around Lot 13, and Plaintiffs selected it as their home site because they liked the corner lot. Plaintiffs chose the Silver Maple as the type of house they wanted built.  They also selected an optional second floor plan and additional upgrades to their home including a two foot rear extension optional floor plan, a brick stone front elevation, and a small kitchen island. Def.'s Ex. 2.  The total sales price of the house, with Plaintiffs' selected options and the lot, was $335,275.

Mrs. Schultz also acknowledged that the Property Sale Contingency Addendum was included as part of the sales agreement because Plaintiffs requested it as part of their contract with DRB.  Def.'s Ex. 3.  The Property Sale Contingency Addendum provided that the contract was contingent upon Plaintiffs selling their home in Falling Waters, West Virginia by October 1, 2006 at 5:00 p.m.  If Plaintiffs were unable to sell their property, then the contract with DRB could be declared null and void and Plaintiffs would be refunded their deposit without any penalty.

On July 11, 2006, Plaintiffs returned to the sales trailer to make additional selections.  Plaintiffs selected their exterior colors, interior colors, fireplace, floors,

4

carpet, and carpet padding.  Def.'s Ex. 2.  Mrs. Schultz testified that her and her husband had an opportunity to discuss options and upgrades as well as look at various samples.  On August 30, 2006, Plaintiffs submitted a change order to DRB.  Mrs. Schultz admitted that her and her husband made changes and selected options on the house up through December 2006 before they closed on the home.

Mrs. Schultz also testified that she and her husband have some experience in purchasing a home.  Mrs. Schultz previously purchased one property.  She testified that the closing for that property was similar to the closing conducted in this case.  Mrs. Schultz also testified that her husband had previously purchased three homes.  In purchasing this home, Mrs. Schultz testified that they were not forced to closing or to close before they were ready.  Plaintiffs had an opportunity to do a walk-through of the home.  Additionally, they were able to ask any questions that they had, and DRB answered those questions.

After closing on the property, Plaintiffs completed a Settlement Survey rating their experience with DRB.  Plaintiffs rated their sales experience with DRB's sales representatives, Kellie Wilkinson and Chara Hickman, as "Good."  Plaintiffs rated the overall construction experience and quality of their home as "Good."  Plaintiffs rated their overall mortgage and loan experience with Monocacy Home Mortgage, LLC as "Good."  Finally, Plaintiffs rated their settlement experience with Bowles, Rice, McDavid, Graff & Love as "Good."  *See* Def.'s Ex. 4.

Mr. Timothy Cowan, current Division President for the Washington West Division of DRB, also testified regarding the policies and procedures in July 2006 for the sale of DRB homes.  Mr. Cowan testified that he was familiar with the policies and procedures

5

in July 2006 with regard to the execution of agreements for sale in contracts accepted by DRB for the sale of homes.  Mr. Cowan testified that the usual procedure for purchasing a home in July 2006 would have been as follows.  First, the purchaser meets with a DRB sales representative.  Next, the purchaser would select the lot.  After they select the lot, the purchaser would select the house type and their options.  Then, the purchaser and DRB sales representative would review each page of the contract and addendum.  Next, the purchaser would pick all of the structural options.  At a later date, the purchaser would come back to select their colors and carpets.  Mr. Cowan testified that, in reviewing contracts with purchasers, the DRB sales manager would print out the contract, review each page, explain each item, ask for any questions, and then request the purchaser to sign the bottom of the page.

Mr. Cowan also testified that the contract and process of purchasing a home involves negotiation, specifically with regard to the options and incentives.  Mr. Cowan testified that purchasers negotiate on the amount of incentives they receive, their credit towards closing costs, the purchase price, and even can negotiate for different options that DRB may not have available, such as upgraded cabinets or specialty flooring.  Additionally, purchasers have negotiated a higher incentive while using their own outside lenders or closing attorneys.  Mr. Cowan also testified that purchasers have negotiated a contract to include an addendum where the sale is contingent upon the purchaser selling his or her home.  Mr. Cowan stated that all sales representatives are trained to go through the contract page by page and paragraph by paragraph, although he had no personal knowledge as to what process the sales representatives followed in this case.  Finally, Mr. Cowan testified that the process to review the contract and select

6

options takes two to four hours, depending upon the number of questions a purchaser might have, the number of options, and the amount of negotiation.  He noted that DRB sales representatives did not have a time limit on reviewing the contract.  Rather, they could take as long as they needed to complete the process.

On January 27, 2012, Plaintiffs filed their Complaint in the Circuit Court of Berkeley County, West Virginia.  On February 8, 2012, DRB was served with the Summons and Complaint.  On February 28, 2012, DRB filed a Notice of Removal removing the case to the United States District Court for the Northern District of West Virginia at Martinsburg.  On March 5, 2012, DRB answered the Complaint raising the existence of the arbitration clause as an affirmative defense.

On March 30, 2012, the parties filed a joint motion to stay pending the outcome of the appeal in *Dan Ryan Builders, Inc. v. Nelson*.  The case was pending before the United States Court of Appeals for the Fourth Circuit and on certified question to the West Virginia Supreme Court of Appeals.  The Court stayed this matter pending the Fourth Circuit's decision because the *Nelson* decision involves the enforceability of the identical arbitration clause at issue in this case.  On November 15, 2012, the West Virginia Supreme Court of Appeals issued its decision.

On January 24, 2013, the parties' filed a Joint Motion to Lift the Stay upon the resolution of the enforceability of the said arbitration provision.  On January 29, 2013, the Court entered an Order granting the Joint Motion to Lift Stay.  On March 21, 2013, DRB filed a Motion to Compel Arbitration.  On March 27, 2013, Plaintiffs filed their response in opposition to DRB's motion.  On April 3, 2013, DRB filed its reply.  On May

7

29, 2013, the Court held an evidentiary hearing in this matter to hear the parties' arguments, listen to testimony, and receive evidence. Therefore, this motion is ripe for the Court's review.

## II. Legal Standard under the Federal Arbitration Act

The Federal Arbitration Act ("FAA") applies to "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof . . . ." **9 U.S.C. § 2**. The FAA reflects "a liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S. Ct. 927 (1983). This policy is supported by Congress's view that arbitration constitutes a more efficient dispute resolution process than litigation. *Hightower v. GMRI, Inc.*, 272 F.3d 239, 241 (4th Cir. 2001). Therefore, "due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration." *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500 (4th Cir. 2002).

A district court also applies "the federal substantive law of arbitrability, which governs all arbitration agreements encompassed by the FAA." *Id.* (citations omitted). However, a district court applies ordinary state law principles governing the formation of contracts, "including principles concerning the 'validity, revocability, or enforceability of contracts generally.'" *Muriithi v. Shuttle Exp., Inc.*, 712 F.3d 173, 179 (4th Cir. 2013) (citations omitted). Section 2 of the FAA provides that arbitration agreements may be declared unenforceable "upon such grounds as exist at law or in equity for the

8

revocation of any contract." **9 U.S.C. § 2**. "This savings clause permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *AT&T Mobility LLC v. Concepcion*, ___ U.S. ___, 131 S. Ct. 1740, 1746 (2011) (quoting *Doctor's Assoc., Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S. Ct. 1652 (1996)).

To compel arbitration under the FAA, the Fourth Circuit held that a moving party must "demonstrate '(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute.'" *Adkins*, 303 F.3d at 500-01 (quoting *Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991)). "Under the FAA, courts must stay any suit 'referable to arbitration' under an arbitration agreement, where the court has determined that the agreement so provides, and one of the parties has sought to stay the action." *Noohi v. Toll Bros., Inc.*, 708 F.3d 599, 604 (4th Cir. 2013) (citing **9 U.S.C. § 3**).

### III.  Discussion

DRB's motion to compel arbitration is based upon the following arbitration clause contained in the Contract:

**19. ARBITRATION.**

(a) Any dispute arising under or pursuant to this Agreement, or in any way related to the Property and/or with respect to any claims arising by virtue of any representations alleged to have been made by Us, or any agents and/or employees thereof, (with the exception of "Consumer Products" as

9

defined by the Magnuson-Moss Warranty Federal Trade Commission Improvements Act, 15 U.S.C. Section 2301 et seq. and the regulations promulgated thereunder) shall be settled and finally determined by arbitration and not in a court of law, irrespective of whether or not such claim arises prior to or after Settlement hereunder, pursuant to the Construction Industry Arbitration Rules and the Supplementary Procedures for Residential Construction Disputes of the American Arbitration Association ("AAA") then in effect.  Prior to commencing arbitration, the dispute shall first be mediated in accordance with the Construction Industry Mediation Rules of AAA, or another mediation service designated by Us.  The parties hereto specifically acknowledge that they are and shall be bound by arbitration and are barred from initiating any proceeding or action whatsoever in connection with this Agreement.  Notwithstanding anything to the contrary herein contained, in the event You default by failing to settle on the Property within the time required under this Agreement, then We may either (i) commence an arbitration proceeding under this Section 19, or (ii) bring an action for its damages, including reasonable attorneys' fees, as a result of the default in a court having jurisdiction over the Purchaser.  You expressly waive your right to mediation and arbitration in such event.  Each party shall be entitled to full discovery in accordance with the local rules of court in the event that arbitration is invoked under this Section 19.  The provisions of this Section 19 shall survive the execution and delivery of the deed, and shall not be merged therein.

(b) In the event that an action is brought in court under Section 19(a) or for any reason a claim is determined not to be subject to binding arbitration under Section 19(a), then You and Us knowing and voluntarily waive our rights to a trial by jury in any action, proceeding or counterclaim related to this Agreement or the Property, including such actions, proceedings or counterclaims in which You and Us as well as others are parties.

Def.'s Ex. 3, ¶ 19.

## A.  All Four Elements Exist for Compelling Arbitration

As outlined above, for DRB to compel arbitration it must "demonstrate '(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce,

and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute.'" **Adkins**, 303 F.3d at 500-01 (quoting **Whiteside**, 940 F.2d at 102).

### 1.  Dispute Exists Between the Parties

The first element is readily satisfied.  DRB identified the existence of a dispute between the parties as Plaintiffs filed suit against DRB in Berkeley County Circuit Court for alleged defects in the construction of their home as well as alleged problems with the septic system installed to service their house.

### 2.  Written Agreement Includes an Arbitration Provision which Purports to Cover the Dispute

The second element is also satisfied.  The contract between Plaintiffs and DRB contains an arbitration provision at Paragraph 19 that purports to cover the dispute. The Fourth Circuit Court of Appeals recognized that a court "may not deny a party's request to arbitrate an issue 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" **Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.**, 96 F.3d 88, 92 (4th Cir. 1996) (citing **United Steelworkers of Am. v. Warrior & Gulf Navigation Co.**, 363 U.S. 574, 582-83, 80 S. Ct. 1347, 1353 (1960)).   The arbitration clause is very broad and covers "[a]ny dispute arising under or pursuant to this Agreement, or in any way related to the Property and/or with respect to any claims arising by virtue of any representations alleged to have been made by [DRB] . . . ."  Def.'s Ex. 3, ¶ 19.

Plaintiffs' Complaint alleged defects in the workmanship of their home, specifically with the concrete in the basement and the garage.  Plaintiffs also alleged that before DRB built their home, it knew that the Class Two Septic System it installed

to service Plaintiffs' house on Lot 13 was not approved for a lot less than two acres. Plaintiffs' disputes arise under and pursuant to the contract and are related to their property.  Accordingly, the arbitration provision covers the disputes.

### 3.  Transaction Related to Interstate or Foreign Commerce

Plaintiffs argue that the transaction is not related to interstate commerce.  The United States Supreme Court "interpreted the term 'involving commerce' in the FAA as the functional equivalent of the more familiar term 'affecting commerce'-words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power." *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56, 123 S. Ct. 2037 (2003) (quoting *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 273-74, 115 S. Ct. 834 (1995)).  The Court noted that "the statute provides for 'the enforcement of arbitration agreements within the full reach of the Commerce Clause,' therefore, it is perfectly clear that the FAA encompasses a wider range of transactions than those actually 'in commerce'-that is, 'within the flow of interstate commerce.'" *Id.* (internal quotation marks, citation, and emphasis omitted).

In this case, the contract was entered into by citizens of two different states as DRB was a Maryland corporation and Plaintiffs were West Virginia residents.  The parties entered into a contract for construction of a home that was built with materials transported in interstate commerce. *See EQT Corp. v. Miller*, Civil Action No. 1:11CV197, 2012 WL 3839417, at *2  (N.D.W. Va. Sept. 5, 2012) (finding agreement related to interstate commerce because "the parties to the [a]greement [were] citizens of two different states and the work performed under the relevant employment relationship

12

involved a product which is largely commercially transported and sold in interstate commerce."). Additionally, the agreement affected interstate commerce because the materials utilized in the construction of the Plaintiffs' home traveled through channels of interstate commerce. Therefore, the contract involved interstate commerce, and the third element is satisfied.

### 4. Plaintiffs Failed to Arbitrate the Dispute

The final element is also satisfied. Plaintiffs failed and refused to arbitrate the dispute by filing the suit in Berkeley County Circuit Court rather than attending arbitration.

### B. "The Savings Clause": No Adequate Defense Exists to Prevent Enforcement of the Arbitration Clause

Plaintiffs argue that the Court should deny DRB's Motion to Compel Arbitration because the arbitration clause is unconscionable. Plaintiffs contend that they are unsophisticated consumers and that DRB is a large, sophisticated corporation. Plaintiffs state that they do not have the financial resources necessary to pay for arbitration. Plaintiffs also argue that the contract provided DRB with a court forum, but did not provide Plaintiffs with a reciprocal remedy. Plaintiffs are not challenging the enforceability of the agreement as a whole; rather, they are challenging the enforceability of the arbitration provision of the agreement, paragraph 19. *See Rent-A-Ctr., West, Inc. v. Jackson*, __ U.S. __ 130 S. Ct. 2772, 2778 (2010) (holding that a party's challenge to an arbitration clause is for the district court to consider, but "[A] party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate.").

Section 2 of the FAA permits courts to invalidate arbitration agreements using general contract principles. *See* **9 U.S.C. § 2**.  "This savings clause permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." ***AT&T Mobility LLC***, __ U.S. ___, 131 S. Ct. at 1746; *see also* Syl. Pt. 6, ***Brown v. Genesis Healthcare Corp.***, 724 S.E.2d 250 (W. Va. 2011) (***Brown I***) overruled on other grounds by ***Marmet Health Care Ctr., Inc. v. Brown***, __ U.S. __, 132 S. Ct. 1201 (2012) ("Under the [FAA], 9 U.S.C. § 2, a written provision to settle by arbitration a controversy arising out of a contract that evidences a transaction affecting interstate commerce is valid, irrevocable, and enforceable, unless the provision is found to be invalid, revocable, or unenforceable upon a ground that exists at law or in equity for the revocation of any contract.").

On certified question from the Fourth Circuit, the West Virginia Supreme Court of Appeals noted that parties frequently challenge the enforceability of arbitration clauses on the ground that the clauses lack consideration or lack equivalent promises. ***Dan Ryan Builders, Inc. v. Nelson***, 737 S.E.2d 550, 558 (W. Va. 2012).  The Court held that "the formation of a contract with multiple clauses only requires consideration for the entire contract, and not for each individual clause." *Id.*  Thus, a single clause within a multi-clause contract does not require separate consideration.

However, the West Virginia Supreme Court of Appeals further concluded that "under the doctrine of unconscionability, a trial court may decline to enforce a contract

14

clause—such as an arbitration provision—if the obligations or rights created by the clause unfairly lack mutuality." *Id.*   Therefore, lack of mutuality of obligation in the formation of a contract is "a factor for a court to consider when assessing whether a contract (or provision therein) is unconscionable." *Id.*

"Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." ***Brown v. Genesis Healthcare Corp.***, 729 S.E.2d 217, 226 (W. Va. 2012) ("***Brown II***').   Under West Virginia law, courts "analyze unconscionability in terms of two component parts: procedural unconscionability and substantive unconscionability." ***Nelson***, 737 S.E.2d at 558 (quoting ***Brown I,*** 724 S.E.2d at 285).   In establishing procedural unconscionability, courts look at "inequities, improprieties, or unfairness in the bargaining process and the formation of the contract, inadequacies that suggest a lack of a real and voluntary meeting of the minds of the parties." ***Nelson***, 737 S.E.2d at 558.   In assessing the substantive unconscionability, a court may look to the "unfairness in the terms of the contract itself, and arises when a contract term is so one-sided that it has an overly harsh effect on the disadvantaged party." *Id.*   In the substantive unconscionability analysis, lack of mutuality in a contractual obligation is a proper element to consider. *Id.* Therefore, "[i]f a provision creates a disparity in the rights of the contracting parties such that it is one-sided and unreasonably favorable to one party, then a court may find the provision is substantively unconscionable." *Id.*

15

### 1.  Procedural Unconscionability

Plaintiffs argue that the contract is procedurally unconscionable for several reasons.  First, Plaintiffs argue the contract was a form document, and they were not given the option to negotiate the terms.  Therefore, Plaintiffs state they were faced with a "take it or leave it" contract.  Second, Plaintiffs contend they are unsophisticated consumers as Mr. Schultz is a machinist and Mrs. Schultz works in medical billing.

Procedural unconscionability requires "gross inadequacy in bargaining power." *Adkins*, 303 F.3d at 502 (quoting *Troy Mining Corp. v. Itmann Coal Co.*, 346 S.E.2d 749, 753 (W. Va. 1986)).  The West Virginia Supreme Court of Appeals set forth the following guidelines for determining procedural unconscionability:

> Procedural unconscionability is concerned with inequities, improprieties, or unfairness in the bargaining process and formation of the contract.  Procedural unconscionability involves a variety of inadequacies that results in the lack of a real and voluntary meeting of the minds of the parties, considering all the circumstances surrounding the transaction.  These inadequacies include, but are not limited to, the age, literacy, or lack of sophistication of a party; hidden or unduly complex contract terms; the adhesive nature of the contract; and the manner and setting in which the contract was formed, including whether each party had a reasonable opportunity to understand the terms of the contract.

Syl. Pt. 17, *Brown I.*

Plaintiffs' first argument is that the Agreement of Sale was a contract of adhesion and thus procedurally unconscionable.   "Procedural unconscionability often begins with a contract of adhesion." *State ex rel. Richmond Am. Homes of W. Va., Inc. v. Sanders*, 717 S.E.2d 909, 921 (W. Va. 2011).  However, "[f]inding that there is an adhesion contract is the beginning point for analysis, not the end of it; what courts aim at doing is distinguishing good adhesion contracts which should be enforced from bad

16

adhesion contracts which should not." *Id.* (quoting *State ex rel. Dunlap v. Berger*, 567 S.E.2d 265 (W. Va. 2002)).   The West Virginia Supreme Court cautioned that although adhesion contracts include all form contracts submitted by one party on the basis of this or nothing, "[s]ince the bulk of contracts signed in this country, if not every major Western nation, are adhesion contracts, a rule automatically invalidating adhesion contracts would be completely unworkable." *Pingley v. Perfection Plus Turbo-Dry, LLC*, __S.E.2d__, 2013 WL 1788224 (W. Va. Apr. 10, 2013).

 *First*, Plaintiffs assert that the Agreement of Sale they entered into with DRB was a form contract, and its terms could not be altered.  Therefore, Plaintiffs contend the Agreement of Sale is an adhesion contract.  West Virginia's Supreme Court of Appeals defines adhesion contracts as "all 'form contracts' submitted by one party on the basis of this or nothing." *State ex rel. Dunlap v. Berger*, 567 S.E.2d at 273 (citations omitted).  In this case, the contract is pre-printed with fill-in-the-blank provisions.  However, the contract could be negotiated.  First, the fill-in-the-blank provisions of the contract were for the base price of the home, the option prices, the initial cash deposit amount, the additional cash deposit amount and date to be paid, the amount DRB contributes to closing costs, the credit for using a preferred settlement attorney, the option to use DRB's preferred settlement attorney or one of the purchaser's own choosing, and a listing of addenda, including blank spaces to enter any addenda not mentioned in the contract.  In this case, there are six addenda, including a Property Sale Contingency Addendum requested by Plaintiffs.

 Mr. Cowan also testified that, per the policies and procedures in 2006 at the

relevant time of this contract, the contract process generally involved negotiation, specifically with regard to the options and incentives.  Mr. Cowan testified that purchasers had the ability to negotiate the amount of incentives they received, their credit towards closing costs, the purchase price, and the options for their home, even if they may not have them available, such as upgraded cabinets or specialty flooring.  Therefore, there was room for negotiation of the terms of the contract, including the fill-in-the-blank provisions.  In fact, Plaintiffs admitted that they selected the lot, the model of the house, and the various options for the home.  Plaintiffs negotiated with DRB throughout the entire process as Plaintiffs made various changes to their home even up to the month of closing.

Additionally, Plaintiffs provide no evidence that there were no meaningful alternatives to signing the Agreement of Sale with DRB.  Plaintiffs were free to seek the services of another homebuilder, as DRB is not the only residential builder in operation in the Berkeley County and Jefferson County areas of West Virginia.  *See **Ciampi v. Dan Ryan Builders, Inc.**,* Civ. Action No. 3:10-CV-55 (N.D.W. Va. July 15, 2010) (noting that "DRB is not the only residential builder in operation in Berkeley County, West Virginia"); *see also **Saturn Dist. Corp. v. Williams***, 905 F.2d 719, 727 (4th Cir. 1990) ("[T]he mere fact that Saturn requires dealers to agree to its arbitration provisions in order to obtain a Saturn dealership does not make its Dealership Agreement non-consensual.  If a dealer does not wish to agree to non-negotiable arbitration provisions, the dealer need not do business with Saturn.").  Mrs. Schultz testified that she and her husband decided in 2006 that they wanted to build a home.  She stated that they began

18

to investigate and contact different builders.  Plaintiffs met with sales agents from S&A Homes in Berkeley County, West Virginia.  However, they ultimately decided on DRB because they preferred DRB's subdivision and lots over  S&A Homes' subdivision and lots.  Therefore, Plaintiffs knew of and researched other available builders in the Berkeley County area.

Plaintiffs have not stated that DRB's arbitration provision was a non-negotiable term.  In fact, there is nothing to suggest to this Court that Plaintiffs attempted to alter or opt-out of the provision.  Although the form was a "fill-in-the-blank" contract, the parties negotiated over the terms to fill in the blank, including the price and other details regarding the construction of the home.  Therefore, this was not a contract of adhesion as terms could be negotiated and modified and there were other meaningful alternatives as Plaintiffs were free to seek the services of another homebuilder.

*Second*, Plaintiffs argue that they are unsophisticated consumers and do not have experience in negotiating agreements compared to DRB, a large sophisticated home builder operating in at least four states.  Plaintiffs are high school graduates, and both have at least some level of education beyond high school.  Mrs. Schultz has a certificate for an accounting program from the Abbey Business Institute.  Mr. Schultz has a bachelors degree in photography from the University of Rochester.  Both Plaintiffs are employed.  Mrs. Schultz is currently employed in medical billing, and she has worked in that field for approximately twenty years.  Mr. Schultz is currently employed as a machinist at Endeavor Technologies in Buckeystown, Maryland.

Plaintiffs did not allege that their age weighs in favor of finding that they are unsophisticated consumers.  *Compare **Arnold v. United Cos. Lending Corp.**,* 511

S.E.2d 854 (W. Va. 1998) (finding an agreement unconscionable based upon predatory lending because United Lending was a national lending institution and the Arnolds were elderly, uneducated consumers) *overruled on other grounds by* **Nelson**, 511 S.E.2d 854.  Also, Plaintiffs are high school graduates with some college or higher education. *Compare* **State ex rel. Saylor v. Wilkes**, 613 S.E.2d 914 (W. Va. 2005) (weighing an employee's "tenth grade education" in favor of finding an employee agreement unenforceable).  Plaintiffs did not allege that they were illiterate or unable to read the contract.  Plaintiffs also had the opportunity to review the contract containing the arbitration provision after they signed the contract and prior to closing as Plaintiffs were provided with a copy of the contract.  Mrs. Schultz admitted that she and her husband only skimmed the documents.  She also admitted that they could have retained an attorney to review the contract, but they did not.  Mrs. Schultz also testified that her and her husband were not rushed to closing, and they were able to ask any questions they had and DRB would answer them.  Plaintiffs failed to identify any conduct on the part of DRB that prevented them from reading and reviewing the contract.  Mrs. Schultz conceded that when reviewing the contract, they were given an opportunity to ask questions, time to read through it, and were not rushed into signing it.  Therefore, Plaintiffs were educated consumers, and they had ample time to read the contract–whether or not they chose to do so.

     ***Third***, Plaintiffs argue that the arbitration provision was not explained to them or highlighted.  Mrs. Schultz testified that when she and her husband signed the contract, the entire process took only five or ten minutes.  However, on cross examination, Mrs.

Schultz stated that the process took about an hour to an hour and a half.  She also

testified that none of the terms were explained to them, and that the arbitration provision

was not pointed out or explained.  Mrs. Schultz testified that she and her husband did

not understand the meaning of arbitration when they signed the contract.  On cross-

examination, Mrs. Schultz testified that DRB's sales representative would go through

the first page of the contract, point out some of the provisions, and then request

Plaintiffs to sign on the bottom of the page.  Mrs. Schultz acknowledged that this was

the same process for every page.  Mrs. Schultz pointed out that DRB's sales

representative did not review every possible thing in the contract.  However, Mrs.

Schultz was aware of the purchase price, the provision regarding the use of a preferred

lender, and according to her testimony, her husband had reviewed paragraph 10

regarding default.  Although Plaintiffs had the opportunity to ask questions, they did not

ask questions about the contract or any of its provisions, including the definition of

arbitration.

    The arbitration provision was not hidden in a lengthy contract.  The contract was

relatively short–seven pages plus eight pages of addenda.  On page 6, the page

including the arbitration provision, the heading is clearly marked in bold typeface and all

capital letters: **19.  ARBITRATION**.  Additionally, Plaintiffs initialed almost directly below

the arbitration provision.  Mrs. Schultz stated they skimmed the contract, but even

skimming the document would have revealed the arbitration provision.  Even though

Mrs. Schultz stated that Plaintiffs skimmed the contract, Plaintiffs specifically

acknowledged when they signed the contract that they had read it and understood its

provisions.  This provision was obvious, as it was in all capital letters directly above the

signature line on the last page of the contract.

Also, the arbitration provision in the contract briefly explained the process to the parties.  First, the provision explained that any claims arising from the contract or by virtue of alleged representations "shall be settled and finally determined by arbitration and not in a court of law."  Second, the provision stated that before "commencing arbitration, the dispute shall first be mediated."  This highlighted that mediation and arbitration are two different processes.  Last, the provision stated that the parties "specifically acknowledge that they are and shall be bound by arbitration and are barred from initiating any proceeding or action whatsoever in connection with this Agreement."  This emphasized that arbitration is a binding process, and that parties are prohibited from initiating other proceedings or actions.  Therefore, the arbitration provision in the contract provided some explanation of the process.

In viewing all the circumstances, Plaintiffs have failed to demonstrate a gross inadequacy in bargaining power suggesting a lack of real and voluntary meeting of minds.  Plaintiffs' age, literacy, education, the lack of hidden or unduly complex terms in the contract, and the manner and setting of executing the contract demonstrate that Plaintiffs had a reasonable opportunity to understand the terms of the contract.  Therefore, in light of all the facts, the Court does not find the contract was procedurally unconscionable.  Although West Virginia law requires a finding of "both 'gross inadequacy in bargaining power' and 'terms unreasonably favorable to the stronger party,'" this Court will also explain why it does not find substantive unconscionability.  *Adkins*, 303 F.3d at 502 (quoting *Troy Mining Corp.*, 346 S.E.2d at 753 (internal citations omitted)).

22

### 2.    Substantive Unconscionability

Plaintiffs argue that the arbitration provision should not be enforced because it is substantively unconscionable as the obligations and rights created by the clause unfairly lack mutuality.  The West Virginia Supreme Court of Appeals explained that "[s]ubstantive unconscionability involves unfairness in the contract itself–'overall imbalance, one-sidedness, *laesio enormis*, and the evils of the resulting contract'–and whether a contract term has 'overly harsh or one-sided results' or is 'so one-sided as to lead to absurd results.'" ***Brown I***, 724 S.E.2d at 287 (internal citations omitted).  Courts must focus their inquiry on "whether the [contract] term is one-sided and will have an overly harsh effect on the disadvantaged party. To determine substantive unconscionability, courts have focused on vague matters such as the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns." *Id.* (internal citations omitted).

In assessing substantive unconscionability, courts should generally consider "the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and public policy concerns." *Id.* at 288. "Substantive unconscionability may manifest itself in the form of an agreement requiring arbitration only for the claims of the weaker party but a choice of forums for the claims of the stronger party." ***Brown II***, 729 S.E.2d at 228.  Therefore, lack of mutuality of obligation is "a factor for a court to consider when assessing whether a contract (or provision therein) is unconscionable." ***Nelson***, 737 S.E.2d at 558.

23

In this case, Plaintiffs' sole argument is that the contract is unconscionable because it lacks mutuality of obligation.  Paragraph 19 provides:

> [I]n the event You default by failing to settle on the Property within the time required under this Agreement, then We may either (i) commence an arbitration proceeding under this Section 19, or (ii) bring an action for its damages, including reasonable attorneys' fees as a result of the default in a court having jurisdiction over the Purchaser.  You expressly waive your right to mediation and arbitration in such event.

Def.'s Ex. 3, ¶ 19.

Plaintiffs characterize the provision as allowing DRB to take Plaintiffs to court on *any* issue while Plaintiffs must arbitrate any issue.  Upon reviewing the relative remedies of the parties, the Court finds that the arbitration provision is commercially reasonable.  Although DRB is permitted to seek a remedy from the courts if Plaintiffs default, this is a narrow remedy.  Essentially, the only instance when DRB may go to court rather than arbitration is to enforce the Agreement of Sale and recover damages in the event of default.  For every other issue arising out of the contract, DRB must go to arbitration.  *See Miller v. Equifirst Corp. of W. Va.*, Civil Action No. 2:00-0335, 2006 WL 2571634, at *11 (S.D.W. Va. Sept. 5, 2006) (finding an agreement was not so one-sided as to be unconscionable where the lender defendants retained access to a judicial forum for foreclosure and bankruptcy proceedings, but were required to arbitrate all other claims).  Therefore, the contract term is not so one-sided as to have an overly harsh effect on Plaintiffs.  Additionally, this Court, as evidenced by the procedural unconscionability analysis, does not find that there is a gross inadequacy in bargaining power as Plaintiffs are sophisticated consumers with higher levels of education and training.  Taking into account Plaintiffs' bargaining position when reviewing the contract,

24

the Court does not find that the terms unreasonably favor DRB as to make the contract unconscionable.

Plaintiffs, in their oral argument before the Court, asserted that the holding in *Richmond American Homes*, where the West Virginia Supreme Court of Appeals found an arbitration provision substantively unconscionable, should also be the holding in this case. The Court finds, however, that *Richmond American Homes* is easily distinguishable from this case. In *Richmond American Homes*, the petitioner, a home builder, was sued by forty adults and children who lived in eleven homes built by the petitioner. 717 S.E.2d at 913. The residents claim they were injured by radon gas leaking into their homes because of construction defects. *Id.* When the residents brought suit against the petitioner, the petitioner asserted that the arbitration provision prohibited their civil action and they should be compelled to arbitrate. *Id.* The Jefferson County Circuit Court held that the arbitration provision was ambiguous and unconscionable. *Id.* Then, the petitioner sought a writ of prohibition to compel the residents to arbitrate their claims. *Id.* The West Virginia Supreme Court of Appeals, in affirming the circuit court, found the arbitration agreement unconscionable for a variety of reasons including that the agreement contained a waiver of any and all claims for property or personal injury or other economic loss resulting from radon gas, provided that petitioner was not liable for diminution in the value of the home as a result of its misconduct, charged Plaintiffs $7,500 per house if they retained a lawyer to review the agreement, and waived Plaintiffs' right to a class action lawsuit. *Id.* at 922-23. In light of all the circumstances, the West Virginia Supreme Court of Appeals found the arbitration

provision was unconscionable. *Id.* at 924-25.

Unlike the contract in **Richmond American Homes**, this contract does not attempt to exculpate DRB from any alleged misconduct.  The contract did not contain any provisions requiring Plaintiffs to waive any statutory or common law warranties.  The contract did not state that DRB is not liable for special, indirect, or consequential damages.  Additionally, the contract did not prohibit Plaintiffs from retaining their own attorney to review the contract, and Mrs. Schultz acknowledged that they could have retained an attorney.

In sum, considering the totality of the circumstances in this case, Plaintiffs have failed to demonstrate that the contract and its terms were so unfair that it resulted in an overall imbalance or one-sidedness of the contract.  Therefore, the Court does not find substantive unconscionability.

### C.    Compelling Defendant Eagle to Arbitration

Plaintiffs filed their Complaint against two defendants: DRB and Eagle Excavating & Contracting, LLC ("Eagle").  Therefore, the Court must determine whether it is proper to submit Plaintiffs' claims against DRB and Eagle to arbitration.  Plaintiffs entered into an arbitration agreement with DRB through the Agreement of Sale, and Eagle was not a party to the contract.  Although Eagle consents to arbitration, Plaintiffs object to submitting their claims against Eagle to arbitration.

As a general principle, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which it has not agreed to arbitrate." **R.J. Griffin & Co. v. Beach Club II Homeowners Ass'n**, 384 F.3d 157, 160 (4th Cir. 2004)

26

(internal quotation marks omitted).  However, "[i]t is well-established . . . that a nonsignatory to an arbitration clause may, in certain situations, compel a signatory to the clause to arbitrate the signatory's claims against the nonsignatory despite the fact that the signatory and nonsignatory lack an agreement to arbitrate."  **Am. Bankers Ins. Group, Inc. v. Long**, 453 F.3d 623, 627 (4th Cir. 2006).

In this case, Defendants argue that the theory of equitable estoppel applies to compel Plaintiffs and all Defendants to arbitration.  There are two circumstances when equitable estoppel allows a nonsignatory to compel arbitration: (1) "when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory" and (2) "when the signatory raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." **Brantley v. Republic Mortg. Ins. Co.**, 424 F.3d 392, 395-96 (4th Cir. 2005) (internal quotations and citation omitted).  The Fourth Circuit Court of Appeals stated that "at a minimum, there must be allegations of coordinated behavior between a signatory and a nonsignatory defendant, and that the claims against both the signatory and nonsignatory defendants must be based on the same facts, be inherently inseparable, and fall within the scope of the arbitration clause."  **Aggarao v. MOL Ship Mgmt. Co., Ltd.**, 675 F.3d 355, 374 (4th Cir. 2012) (internal citations and quotations omitted).

The West Virginia Supreme Court of Appeals has applied equitable estoppel as a basis for enforcing a forum selection clause against signatories and nonsignatories to a contract.  See **Caperton v. A.T. Massey Coal Col., Inc.**, 690 S.E.2d 3232, 347 (W. Va.

27

2009) ("In order for a non-signatory to benefit from or be subject to a forum selection clause, the non-signatory must be closely related to the dispute such that it becomes foreseeable that the non-signatory may benefit from or be subject to the forum selection clause.") (noting cases applying equitable estoppel to bind a nonparty of a contract to the contract's arbitration or forum selection clause).  Additionally, arbitration clauses have been recognized as a form of a forum selection clause. ***Holmes v. Chesapeake Appalachia, LLC***, Civil Action No. 5:11-cv-123, 2012 WL 3647674, at *12 (N.D.W. Va. Aug. 23, 2012).

Plaintiffs' Complaint alleges multiple claims against Eagle.   Plaintiffs allege that DRB concealed knowledge of an illegal septic system and Eagle installed the system for DRB knowing it was illegal.  Plaintiffs seek damages against DRB and Eagle jointly and severally for fraud.  Plaintiffs also allege negligence, gross negligence, and willful, wanton, and reckless misconduct by DRB and Eagle.  Plaintiffs contend that "[b]oth DRB and Eagle owed a duty to [Plaintiffs] not to place a[n] illegal septic system on Lot 13 . . . ." Compl., ¶ 60.  For all of the counts alleged in Plaintiffs' Complaint, Plaintiffs seek recovery against DRB and Eagle.

In reviewing Plaintiffs' claims against Eagle, Plaintiff alleges that Eagle, a nonsignatory, engaged in coordinated behavior with DRB, a signatory, because DRB concealed the installation of an illegal septic system and Eagle installed the septic system for DRB knowing it was illegal.  Additionally, Plaintiffs seek damages against Eagle and DRB, jointly and severally, for each count of the Complaint.  In examining Plaintiffs' Complaint, their claims against DRB and Eagle are based on the same facts

and are so intertwined that they are inherently inseparable.  Additionally, Plaintiffs expressly allege that DRB and Eagle were acting in concert.  Plaintiffs' claims against Eagle also fall within the scope of the arbitration clause as they are related to the subject property.  Accordingly, Plaintiffs' claims against Eagle are properly referred to arbitration.

## IV.  Conclusion

For the reasons stated above, this Court finds that Defendant's Motion to Compel Arbitration [Doc. 18] should be, and hereby is, **GRANTED**.  Accordingly, Plaintiffs' claims against Dan Ryan Builders, Inc. and Defendant Eagle Excavating & Contracting, LLC and Defendants' interrelated cross-claims are **STAYED** and **SUBMITTED TO ARBITRATION** in accordance with Paragraph 19 of the Agreement of Sale.  The parties are **DIRECTED** to notify this Court forthwith upon the conclusion of the matter.

It is so **ORDERED**.

The Clerk is hereby directed to transmit copies of this Order to all counsel of record herein.

**DATED:** July 3, 2013

GINA M. GROH
UNITED STATES DISTRICT JUDGE